17058

DOBY E. GORODON, Appellant, v. E. I. du PONT de NEMOURS & CO., Respondent

(88 S. E. (2d) 844)

*Messrs. Murchison & West,* of Camden, *for Appellant,*

*Messrs. Savage & Marion,* of Camden, *for Respondent,*

August 23, 1955.

LEGGE, Justice.

On Friday, March 9, 1951, shortly before the close of work, appellant, a carpenter then in the employ of respondent at Camden, South Carolina, strained his back while lifting a piece of lumber. He made no report of it at the time, and went back to work on his next regular work day, the following Monday. After he had been at work for a short time that morning, he was in the act of picking up a piece of lumber when he collapsed with a sudden severe pain in his back. He was carried to the company infirmary, and after treatment there was put on light work and continued on the job at full pay. Thereafter and until April 5, 1951, he was given diathermy treatment daily by the company nurse. On April 20, 1951, he was returned to full duty as a carpenter. On April 25, 1951, he was laid off, along with a number of other carpenters, due to lack of work. On May 3, 1951, he entered the employ of Daniel Construction Company at Rock Hill, South Carolina, as a carpenter. On May 26, 1951, he filed with respondent a formal claim for compensation. He continued to work for Daniel Construction Company full time at regular carpenter's wages until July 23, 1951. On that day, in the course of his employment, he was on his knees boring holes with a brace and bit in the top of a tank, when he had another "catch" in his back, collapsed, and was taken to a hospital, where he remainded for several days.

At the hearing of appellant's claim against respondent on August 13, 1951, the Hearing Commissioner granted respondent's motion to join Daniel Construction Company as a party to the proceeding, and the hearing was adjourned for the taking of further testimony. The Full Commission, on appeal from the order of the Hearing Commissioner joining Daniel Construction Company, affirmed; and thereafter, on appeal by Daniel Construction Company to the Court of Common Pleas, the action of the Full Commission was affirmed. Daniel Construction Company having been thus joined, appellant on July 21, 1952, entered into a settlement agreement with it under which, with the approval of a ma-

jority of the Commission, in consideration of the payment to him of $1,500.00, he released that company and its insurance carrier from all claims that he might have by reason of the accident of July 23, 1951. Hearing on the claim against respondent was resumed on September 11, 1952, and on December 1, 1952, the Hearing Commissioner filed an Opinion and Award finding as a fact that appellant's compensable disability resulted not from the accident of March 9, 1951, but from the accident of July 23, 1951, and denying the claim. On appeal to the Full Commission, this Opinion and Award was affirmed, and thereafter on appeal to the Court of Common Pleas, the Award of the Full Commission was affirmed by order of the Honorable E. H. Henderson, Presiding Judge. This appeal is from Judge Henderson's order.

There is but one fundamental issue involved and that a factual one, namely: was appellant's compensable disability caused by the accident of March 9, 1951, or by the accident of July 23, 1951. That issue having been decided by the Commission as before stated, our review is limited to determination of whether there was any competent testimony tending to support the Commission's finding.

The substance of appellant's testimony was as follows:

During the week-end following the accident of March 9, 1951, the pain in his back subsided and he "went back to work on Monday feeling fine"; but on his first job on Monday morning, picking up lumber, when he stooped and picked up his end of a piece of 4 x 6, he collasped with a "catch" in his back, and was unable to get up. He was carried on a stretcher to the company doctor, who gave him "some shots", and after about an hour he went back on the job, and did not do any more work that day as his back continued to hurt. For four days he was put on work sorting out bolts and taps, but up to the time he left respondent's employ did nothing involving lifting or manual labor. During the first four days after the accident (March 12), he went to the doctor twice a day and after that once

a day until April 25, 1951, when he was laid off with a number of other men. About a week after he was laid off he got a job with Daniel Construction Company at Rock Hill and worked there until July 23, 1951. He lost no time at the duPont Company plant, and did not see a doctor after he left that company until June 7, 1951, when he returned to Dr. Watson at the duPont plant, where an x-ray was taken. He worked steadily for Daniel Construction Company doing ordinary carpenter work, and was "getting along all right" until "I was drilling the hole in the tank", on July 23. The tank was a wooden one, about two inches thick, and appellant was on his knees boring the hole with a hand brace and one-inch bit, applying pressure with his hand. At the time of his entering the employ of Daniel Construction Company, appellant said nothing about having a back injury.

Dr. T. L. Watson, the physician of the duPont Company at its Camden plant, testified as follows:

Witness first saw appellant on March 12, 1951, at 8:30 a. m., when appellant was brought in to the first aid station on a stretcher. Examination revealed one spot in the center of the spinal third of the sacrum that was very tender and seemed to be the point of all of his pain. Most of his pain was relieved by injection of novocain in this area, an adhesive strap belt was put around him, and he went back to the carpenter shop to perform light duty, with no lifting or climbing. Appellant returned to first aid that afternoon, complaining of constant pain in the back; and he was put under diathermy and given an elastic support. He was also supplied with sufficient codein and aspirin to afford relief from pain during the night. Witness saw him next at 8:15 a. m. on March 13, at which time he stated that he had not slept much, but that his back was better. After another diathermy and re-strapping of the back, appellant returned to his duties in the carpenter shop. He came back and was given another diathermy at 2:45 p. m. Witness saw him again at 8:10 a. m. on March 14, and appellant then

said the he had slept well but was slightly more stiff and somewhat sore. At that time the area of tenderness extended from the upper sacral to the lower second lumbar vertebra. He was given diathermy twice on that day, and these treatments continued on March 15, 16, 19, 20, 21, 22, 23, 26, 27 and 28, and again on April 5 (March 17-18 and 24-25 were week-ends, not working days). On April 9 he was treated for sore throat. On April 19 he complained of pain in the chest. On April 20, he told witness that his back felt pretty good, and he was released for regular carpenter duties at 3:45 p. m. On April 25, the day that appellant was laid off, he came in to see Dr. Watson to be released. At that time he said he still had a little discomfort in his back, and he did not want to sign the usual statement that he was in good health. On June 7, appellant again came in, saying that he had come to let Dr. Watson know that his back was still hurting and that he had been in continual pain, day and night, ever since he had left on April 25; that he could get only an hour and a half of sleep at night; that the pain was sharp on retiring, but later would become throbbing; that, on rising, the pain was most noticable and sharp, and became throbbing during the day; that he could not sit or stand without the pain becoming more intense; that he had been to a doctor, who had given him something to rub on his back, and that this had given relief for about two weeks, at which time he had stopped using it; that he could only do little jobs here and there; and that he wanted to get some treatment to enable him to go back to work. When asked to indicate the point of pain, he indicated the upper sacral region. Pressure over this area produced reaction of pain or discomfort; but when witness put one hand on appellant's hip and diverted his attention, he could press very hard over the same area without any reaction of discomfort on the part of appellant. There was no complaint of radiation of pain in the upper thigh or groin, or below the knee. Radiation of pain below the knee is significant of a ruptured disc. None of the pain complained of indicated a

ruptured disc. *x*-ray taken at that time showed nothing unusual; but an *x*-ray is a confirmatory, rather than conclusive, test for a ruptured disc. From his examination, rather than from the *x*-ray, witness was of the opinion that appellant did not have a ruptured disc; and in the opinion of the witness appellant was "exaggerating a little bit".

Dr. James T. Green, a witness for respondent, testified as follows:

Witness examined appellant on July 7, 1951, and again on August 24, 1951. *x*-rays taken on both occasions revealed no evidence of bone disease or injury. Summarizing his examination on July 7, Dr. Green stated that it was his impression at that time that appellant had a nerve root irritation at the lumbo-sacral joint on the left side, possibly a ruptured disc, but not a condition requiring operation; that he should be kept under observation and should continue on with his work, it being Dr. Green's opinion that driving daily from Camden to Rock Hill and there doing full work as a carpenter would not cause any material disturbance in his condition, which would probably clear up within several weeks. At the time of the examination on August 24, 1951, appellant stated that he had continued to work with Daniel Construction Company since the previous examination and until July 23, 1951 when he had had a sudden acute pain in the low part of the back while boring holes in the top of a tank, using a hand brace and one-inch bit; that the pain had been so severe that he was sent to Dr. Angus Hinson, of Rock Hill, who examined him and advised him to return to his home in Camden and come back to Dr. Hinson's office the next day; that next morning, on his way to Rock Hill, he became sick and had to return home; that the following day he was driven to Rock Hill, where he was hospitalized for three days, with traction applied to the left leg; that five days after his discharge from the hospital he consulted Dr. William A. Boyd, of Columbia, following whose examination he had been placed in the Columbia Hospital, where he remained

for three days, during which time he was x-rayed and fluoroscoped; and that he was told by Dr. Boyd that he had a ruptured disc; that upon his return home he spent most of a week in bed; and that since he was fluoroscoped at the hospital he had suffered with back-ache and head-ache, his sleep had been greatly disturbed, and he had since July 7, 1951, lost twenty-five pounds in weight. From his examination on August 24, Dr. Green was of the opinion that appellant had a herniation of the nucleus pulposus, or, in common parlance, a ruptured intervertebral disc, and that in all probability surgical treatment would be required. In Dr. Green's opinion appellant, on July 7, 1951, was not disabled, although he had "some disturbance in the low part of the back on physical examination"; but on August 24, 1951, "he had a marked limitation of back motion with muscle spasm and pain, and was disabled"; and in the opinion of this witness, the disability was the result of appellant's boring a hole with a brace and bit on July 23, 1951, the strain of which probably aggravated the latent condition of his back.

Dr. William A. Boyd, a witness for appellant, testified as follows:

As the result of his examination, x-ray, and myleogram during the period August 1-3, 1951, witness was of the opinion that appellant had a ruptured disc and would be disabled until it was operated on. Under direct examination, Dr. Boyd gave it as his opinion that the ruptured disc and appellant's consequent disability were the result of the injury in March, and not of the one in July, 1951. On cross-examination, he testified:

"Q. Assuming that he had this disc trouble beginning back in March, it is possible as you say for anything to cause an aggravation of that? A. Yes, sir.

"Q. And it is also possible that he could have gone on perhaps indefinitely without any trouble? A. Yes.

"Q. All right. Wouldn't you say then, doctor, as a result of your examination, that this accident on July 23rd

aggravated the condition that he had? A. I wouldn't use the word 'aggravated.' I would use the word 'activated'.

"Q. But nevertheless what happened on July 23rd produced such a condition in him that he could no longer work? A. Well, that was the second time it happened when he stooped over. It activated a condition that was quiescent.

"Q. It was quiescent at that time? A. When you have an arthritic joint and you are getting along wonderfully well and then you have an accident to the arthritic joint. That accident activated the arthritic joint that was there.

"Q. In other words, this condition could have remained quiescent for a long time? A. Yes.

"Q. Indefinitely? A. Yes, sir. That is in the realm of possibility.

\* \* \*

"Q. In other words, doctor, finally in your opinion this strain that he had in July was sufficient to activate, as you call it, a quiescent condition so that he could no longer work? A. That is my opinion."

It will be noted that Dr. Watson did not see appellant after June 7, 1951, and consequently his testimony relates only to appellant's condition, and statements, with regard to the accident of March 9-12, 1951. In substance, it was to the effect that appellant was under no disability on April 20; and that appellant was "exaggerating a little bit" in his complaints on June 7. Dr. Watson's account of appellant's statements on that date is in sharp contradiction to the latter's testimony as to his condition between April 25 and June 7, 1951. For example, appellant testified that he had not seen a doctor from the time he was laid off, on April 25, until he returned to the duPont plant to see Dr. Watson on June 7; but Dr. Watson testified that on the latter date appellant told him he had been to a doctor, who had given him something to rub on his back. And further, appellant testified that he had worked steadily for Daniel Construction Company, doing ordinary carpenter work, from May 3 to July 23; but Dr. Watson testified that ap-

pellant told him on June 7 that he could only do little jobs here and there, and that he wanted to get some treatment to enable him to go back to work.

Doctors Green and Boyd were in substantial agreement that the condition of appellant's back resulting from the injury of March 9-12, 1951, was in July of that year a latent or quiescent one, and not disabling until its aggravation or activation by the injury of July 23.

The rule is well established that where a latent or quiescent weakened, but not disabling, condition resulting from disease is by accidental injury in the course and scope of employment aggravated or accelerated or activated, with resulting disability, such disability is compensable. *Cole v. State Highway Dept.*, 190 S. C. 142, 2 S. E. (2d) 490; *Green v. City of Bennettsville*, 197 S. C. 313, 15 S. E. (2d) 334; *Ferguson v. State Highway Dept.*, 197 S. C. 520, 15 S. E. (2d) 775. The same principle is equally applicable where the latent, but not disabling, condition has resulted from a prior accidental injury. If the disability is proximately caused by the subsequent accidental injury, compensability is referable to that, and not the earlier, one. 58 Am. Jur., Workmen's Compensation, Section 278, p. 775; *Cromer v. Newberry Cotton Mills*, 201 S. C. 349, 23 S. E. (2d) 19; *Ducker v. Dunean Mills*, 218 S. C. 465, 63 S. E. (2d) 314.

In the case at bar, whether appellant's compensable disability was the result of the accident of March 9-12, or of the accident of July 23, 1951, was, as we have said, a factual one, to be resolved by the Commission. We cannot say, from the record before us, that there was no testimony to support the Commission's finding that his compensable disability resulted from the latter, and not the former, injury.

Affirmed.

STUKES, TAYLOR, OXNER, JJ., and JOSEPH R. MOSS, Acting Associate Justice, concur.